**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAPHNE PICKENS,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **CASE NO.** _____ |
| **NATIONWIDE HEALTHCARE** | : | |
| **SERVICES, LLC d/b/a** | : | |
| **BROOKSIDE HEALTHCARE &** | : | **JURY TRIAL DEMANDED** |
| **REHABILITATION CENTER,** | : | |
| | : | |
| **Defendant.** | : | |

**COMPLAINT**

Plaintiff Daphne Pickens ("Ms. Pickens"), by and through her undersigned attorneys, brings this Complaint against Defendant Nationwide Healthcare Services, LLC d/b/a Brookside Healthcare & Rehabilitation Center ("Brookside"), and alleges as follows:

**INTRODUCTION**

1.     This action arises out of Brookside's illegal termination of Ms. Pickens's employment. Ms. Pickens asserts claims for violation of Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act, and the Americans with Disabilities Act.

**THE PARTIES**

2.     Plaintiff Daphne Pickens resides at 1506 Birchwood Avenue, Roslyn, Pennsylvania 19001, and at all times relevant to this action was employed by Brookside. She is black.

3.      Defendant Nationwide Healthcare Services, LLC d/b/a Brookside Healthcare & Rehabilitation Center is a New Jersey limited liability company with a principal place of business at 260 Chambers Bridge Road, Brick, New Jersey 08723. Brookside Healthcare & Rehabilitation Center operates at 2630 Woodland Road, Abington, Pennsylvania 19001, and this is the location where Ms. Pickens worked.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

5.      The Court may also maintain supplemental jurisdiction over the Pennsylvania state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more of the claims within the Court's original jurisdiction that they form part of the same case or controversy.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Brookside conducts business in this District and because a substantial part of the events or and/or omissions giving rise to the claims set forth herein occurred in this District. Ms. Pickens was employed in this District at the time of the illegal actions set forth herein.

## ADMINISTRATIVE PROCEEDINGS

7.     Ms. Pickens has satisfied the procedural and administrative requirements for proceeding with an action under Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act, and the Americans with Disabilities Act.

8.     Ms. Pickens timely filed a written charge of discrimination with the Philadelphia office of the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on or about August 7, 2017 (Charge No. 530-2017-03528).

9.     In her charge submitted to the EEOC, Ms. Pickens requested that the EEOC cross-file her charge with the Pennsylvania Human Relations Commission.

10.     This action is timely because it is initiated within ninety days after the issuance of a Right to Sue Notice from the EEOC dated July 29, 2018, and received by Ms. Pickens on July 31, 2018.

11.     Ms. Pickens has exhausted her administrative remedies as to the allegations in this Complaint.

## STATEMENT OF FACTS

### Ms. Pickens's Career in the Health Field Prior to Joining Brookside

12.     Ms. Pickens has been working in the health field for many years.

13.     From 1984-1990, Ms. Pickens worked as a health officer for Abington Township.

3

14.    From 1990-1993, Ms. Pickens worked for the Montgomery County Health Department as the Director of Environmental Health Services.

15.    Ms. Pickens subsequently went to school to become a nurse.

16.    Ms. Pickens began her career in nursing in 1999 as a staff nurse at the Medical College of Pennsylvania Hospital. She worked there until 2005.

17.    From 2006-2009, Ms. Pickens worked at Elkins Park Hospital as a staff nurse.

18.    From 2009-2012, Ms. Pickens worked at Chestnut Hill Hospital as a staff nurse.

19.    From 2012-2013, Ms. Pickens worked at Germantown Nursing Home as a Nursing Supervisor.

## Ms. Pickens's Employment at Brookside

20.    On April 13, 2013, Ms. Pickens began working at Brookside as a Nursing Supervisor.

21.    Her job duties included training nurses, admissions, making rounds in the entire building during her shift, resolving medication issues with the pharmacy, calling 9-1-1 when necessary.

22.    Although not part of her job duties, Ms. Pickens was asked on occasion by Brookside to push the approximately 75-pound medication cart and administer drugs to residents only when there were staffing issues and there were no staff nurses or charge nurses to do this.

4

23.    Ms. Pickens excelled as a Brookside employee and, as a result, she received positive feedback about her performance. For example, in the summer of 2016, Ms. Schwendiman offered Ms. Pickens a Unit Manager position and asked her to "name her price" for compensation.

24.    Ms. Pickens was never disciplined for any improper conduct.

25.    Ms. Pickens enjoyed working at Brookside and enjoyed the people she worked with.

**Ms. Pickens's Disability**

26.    Ms. Pickens is a member of a protected class because she suffered from a disability, specifically a bulging disc and nerve damage in the lumbar region of her back.

27.    Ms. Pickens's disability substantially limits one or more major life activities including, but not limited to, lifting, bending, pushing, stooping, climbing, running, standing for long periods, and sitting for long periods.

28.    Ms. Pickens's disability began in 2008 first as a bulging disc. She went to physical therapy and received other medical treatment.

29.    Brookside was aware of Ms. Pickens's disability.

30.    On January 24, 2016, Ms. Pickens fell in Brookside's parking lot during a snowstorm after being told by Brookside that she had to move her car to allow for plowing.

31.    Ms. Pickens reaggravated her lower back issue as a result of this fall.

32. Ms. Pickens informed Nicole Brown (a Brookside HR employee) about her injury and was told to go to WORKNET Occupational Medicine.

33. She was evaluated at WORKNET and began physical therapy there.

34. Ms. Pickens was then referred to the Rothman Institute for evaluation, which in turn referred her to ATI Physical Therapy.

35. Ms. Pickens received two rounds of cortisone injections and received a procedure in August 2016 that burned certain nerve receptors. The latter procedure did not go well and led to nerve damage.

36. Ms. Pickens takes medications to treat the pain.

37. Brookside was aware of Ms. Pickens's treatment because the fall was reported to Brookside's workers compensation insurance company, and both an adjuster from the insurance company and a case manager were involved and informed throughout the entire treatment process.

**Ms. Pickens's Firing**

38. Ms. Pickens kept working following her fall on January 24, 2016, but she was placed on restricted light duty.

39. Ms. Pickens continued to do all of her duties that she performed before the fall. Although not one of her duties, she did not push the medication cart which was covered by the work restriction.

40. In August 2016, Ms. Pickens was taken off light duty restriction and went back to her supervisor duties.

41. Since then, approximately once a week she was forced to push the approximately 75-pound medication cart and administer medications to residents. She was forced to do this because nurses would call out and Brookside failed to get other nurses to cover. So, someone had to push the cart and administer medications to the residents and she was the only one there to do it.

42. Pushing the cart was extremely painful and it took two days for Ms. Pickens to recover from it.

43. Ms. Pickens complained to Ms. Brown, Donna Schwendiman (Director of Nursing), and Jennifer Thomas (Assistant Director of Nursing) about the staffing issues and having to push the medication cart. Ms. Schwendiman ignored Ms. Pickens. Ms. Brown and Ms. Thomas responded that they tried to find nurses to cover for the call-outs, but could not find anyone. Ms. Pickens documented the call-outs in the staffing book.

44. On January 21, 2017, Ms. Pickens was forced yet again to push the medication cart due to call-outs and resulting staffing issues.

45. Another Nursing Supervisor helped Ms. Pickens, but she has MS and therefore Ms. Pickens did virtually all the work.

46. Ms. Pickens had to push the medication cart again on January 30, 2017, due to the same staffing issues.

47. On February 7, 2017, Ms. Thomas informed Ms. Pickens that there was another call-out and Ms. Pickens had to push the medication cart.

48.   Ms. Pickens responded that she could not push the medication cart due to her disability.

49.   Ms. Thomas then contacted Ms. Schwendiman, who asked Ms. Pickens to write a statement why she could not push the medication cart.

50.   Ms. Pickens wrote a statement and gave it to Ms. Thomas.

51.   Ms. Pickens then clocked out because she was told by Brookside that she could not do the assignment of pushing the medication cart.

52.   The next morning, Ms. Pickens received a call from Ms. Brown and Ms. Schwendiman. They told Ms. Pickens not to go to work that day because they were still investigating why she was unable to push the medication cart.

53.   On February 9, 2017, Ms. Pickens received a text message from Ms. Schwendiman around 9:30 am stating that she would call Ms. Pickens around 11:30 am with an update. Ms. Pickens responded "ok."

54.   Ms. Pickens received another text message from Ms. Schwendiman at 11:30 am that she would call Ms. Pickens after she heard from corporate HR.

55.   That afternoon, Melissa Hallman (Brookside Administrator) called and told Ms. Pickens not to report to work that day for her 3:00 pm – 11:00 pm shift because they were still investigating, and they would call Ms. Pickens the next day with an update.

56. On February 10, 2017, Ms. Schwendiman and Ms. Brown called Ms. Pickens around 2:00 pm. Ms. Schwendiman informed Ms. Pickens that Brookside was terminating her based on job abandonment.

57. Ms. Pickens has never received a letter of termination.

**White and/or Non-Disabled Nurses Who Were Not Fired or Disciplined**

58. The real reasons for Ms. Pickens's termination were because of her race and disability.

59. The employee who replaced Ms. Pickens is white and does not have a disability.

60. Brookside has a pattern and practice of terminating black nurses.

61. Brookside terminated the employment of six black nurses between June 2016 and February 2017 and replaced four of them with white employees.

62. In addition to this pattern and practice of firing black nurses, Brookside treated white nurses better than Ms. Pickens. Brookside also treated non-disabled nurses better than Ms. Pickens.

63. For example, Linda Lastowski is a white, non-disabled Nursing Supervisor in the nursing department at Brookside. She was not fired for committing four egregious mistakes that Brookside knew about. First, she routinely came to work late and slept in her car from 2:00 am – 4:00 am during her shifts. She was not disciplined for this conduct. Second, she stayed at work late to take

9

advantage of overtime, essentially stealing time, even though she came to work late and slept in her car. She was not disciplined for this conduct. Third, she committed many medication errors, including leaving the medication cart open and pills exposed for anyone to take, but was not disciplined. Finally, in or around July or August 2016, she told another nurse that if she had a gun she would shoot Ms. Pickens. That nurse told Ms. Pickens about this threat from Ms. Lastowski and Ms. Pickens reported it to Ms. Brown. Ms. Hallman organized a meeting to "clear the air." The attendees were Ms. Pickens, Ms. Lastowski, Ms. Hallman, and Ms. Brown. At the meeting, Ms. Hallman stated that she would not fire Ms. Lastowksi for making the threat against Ms. Pickens, and she made light of the situation minimizing the serious nature of what happened. Ms. Lastowksi was eventually suspended for one day as discipline, but nothing more.

64. For another example, Gwen Esdell is a white, non-disabled LPN and charge nurse in the nursing department at Brookside. She committed numerous medication errors, including leaving pills out and failing to administer medication to residents, but was not fired or even disciplined for these errors.

## COUNT I

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT – RACE DISCRIMINATION

65. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

10

66. At all relevant times, Brookside was an employer with 15 or more employees and therefore subject to the provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq* ("Title VII").

67. Brookside's unlawful discrimination against Ms. Pickens on the basis of her race violated Title VII.

68. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

69. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT II

## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT – RACE DISCRIMINATION

70. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

71. As a Pennsylvania employer, Brookside is subject to the provisions of the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.* ("PHRA").

72. Brookside's unlawful discrimination against Ms. Pickens on the basis of her race violated the PHRA.

11

73. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

74. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT III

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT – DISCRIMINATION

75. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

76. At all relevant times, Brookside was an employer with 15 or more employees and therefore subject to the provisions of the American with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* (1990) ("ADA").

77. Upon information and belief, at all relevant times, Brookside received federal funds and/or federal financial assistance and therefore subject to the provisions of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (1973) ("Rehabilitation Act").

78. Ms. Pickens was a qualified individual with a disability within the meaning of the ADA and Rehabilitation Act, as she suffered from a physical impairment that substantially limits one or more major life activities.

12

79.   Ms. Pickens informed Brookside of her disability.

80.   Despite her disability, Ms. Pickens was able to perform the essential functions of her job, with or without reasonable accommodation.

81.   Based on Ms. Pickens's disability, Brookside took adverse action against her by unlawfully terminating her employment in violation of the ADA and Rehabilitation Act.

82.   In addition to or in the alternative to Brookside's discriminatory termination of Ms. Pickens based on her race in violation of Title VII and the PHRA, Brookside terminated her employment based on her disability in violation of the ADA and Rehabilitation Act.

83.   As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

84.   Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT IV

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
AND THE REHABILITATION ACT –
FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS;
FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**

85.   Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

13

86. Brookside unlawfully failed to engage in the interactive process and failed to accommodate Ms. Pickens's disability in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A), and Rehabilitation Act.

87. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

88. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT V

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT– RETALIATION

89. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

90. Brookside unlawfully retaliated against Ms. Pickens for requesting a reasonable accommodation in violation of the ADA, 42 U.S.C. § 12203(a), and Rehabilitation Act.

91. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

92. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT VI

## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT – DISABILITY DISCRIMINATION

93. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

94. Brookside's unlawful discrimination against Ms. Pickens on the basis of her disability violated the PHRA.

95. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

96. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## COUNT VII

## VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT – FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS; FAILURE TO PROVIDE A REASONABLE ACCOMMODATION

97. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

98. Brookside unlawfully failed to engage in the interactive process and failed to accommodate Ms. Pickens's disability in violation of the PHRA.

15

99. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

100. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

### COUNT VIII

### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT – RETALIATION

101. Ms. Pickens hereby incorporates by reference the averments in all of the paragraphs set forth above.

102. Brookside unlawfully retaliated against Ms. Pickens for requesting a reasonable accommodation in violation of the PHRA.

103. As a direct and proximate result of Brookside's discriminatory termination of her employment, Ms. Pickens suffered and continues to suffer damages, including but not limited to economic harm, emotional distress damages, stress, damage to her reputation, as well as disruption in her professional and personal life.

104. Brookside's actions were willful, wanton, intentional, and motivated by a desire to harm Ms. Pickens.

## JURY TRIAL DEMAND

Ms. Pickens demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daphne Pickens respectfully prays for judgment against Defendant Nationwide Healthcare Services, LLC d/b/a Brookside Healthcare & Rehabilitation Center for:

    a.    Back pay;

    b.    Front pay;

    c.    Compensatory damages;

    d.    Damages for economic harm, harm to reputation, and emotional distress;

    e.    Punitive damages;

    f.    Award all damages and remedies to which Ms. Pickens is entitled under Title VII, the PHRA, the ADA, and the Rehabilitation Act;

    g.    Prejudgment and post-judgment interest;

    h.    Costs and expenses of litigation including reasonable attorneys' fees; and

    i.    Further relief as this Court deems just and proper.

Respectfully submitted,

STEVE HARVEY LAW LLC

Dated: October 26, 2018          By: _____

David V. Dzara (PA 91274)
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19013
(215) 438-6600
david@steveharveylaw.com

*Attorneys for Plaintiff Daphne Pickens*

18